**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **RANDY LEE DRAKE,** | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. _____ |
| | ) | |
| VS. | ) | JUDGE _____ |
| | ) | |
| **MONTGOMERY COUNTY, TENNESSEE,** | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DAMAGES

COMES NOW the Plaintiff, by and through Counsel, and files this Complaint for Damages, showing unto the Court the following facts, to wit:

1. Plaintiff, Randy Lee Drake ("Mr. Drake"), is an adult resident citizen of Robertson County, Tennessee.

2. Defendant, Montgomery County, Tennessee ("Montgomery County"), is a Tennessee governmental entity organized and existing according to the laws of the state of Tennessee.

3. Montgomery County is a part of a board-governed entity known as Bi-County Solid Waste Management System ("Bi-County"), which was created to officially oversee a three-county Municipal Solid Waste Region, consisting of the contiguous counties of Montgomery, Stewart, and Robertson Counties in Tennessee, all as contemplated in Tenn. Code Ann. §§ 68-211-801 et seq., such Code Sections being commonly known as the "Tennessee Solid Waste Management Act of 1991" ("Act"). Specifically, Bi-County has been operating as a municipal solid waste authority since 1974, pre-dating such Act, and in harmony with an active Municipal Solid Waste Regional Board ("Board") serving the aforementioned counties, as formed under said Act. Several years

1

ago, Robertson County, Tennessee removed itself from association with the original Solid Waste Region, as aforementioned.

## JURISDICTION AND VENUE

4.     This is an action for unlawful employment practices brought under 42 U.S.C § 1983; the Tennessee Public Employee Political Freedom Act, Tenn. Code Ann § 8-50-601 *et seq.* ("PEPFA"); and Tennessee Law.  The court has jurisdiction under 28 U.S.C §§ 1331, 1343(a)(4), and 1367 (a).  Venue is proper under 28 U.S.C § 1391.  All facts and occurrences as set forth in this lawsuit took place in Montgomery County, Tennessee.

## FACTS COMMON TO ALL ALLEGATIONS OF RETALIATION

5.     By written Inter-Local Agreement, as ratified between the two legislative bodies of Montgomery and Stewart Counties, in or about October, 2016, such Counties mutually agreed that, through a common Board, they would "continue to jointly and cooperatively operate a solid waste collection and disposal system known as the Bi-County Solid Waste Management System . . . There is established a Bi-County Solid Waste Management Board which shall be the agent of the parties for the administration of the system."

6.     However, because of its composition and stated manner of selection of members, the Board is controlled almost entirely by the County Mayor of Montgomery County.  Specifically, the Inter-Local Agreement sets forth that "the Board shall be composed of seven (7) members, four (4) of whom shall be appointed by the County Mayor of Montgomery County subject to confirmation by the legislative body of that County, one (1) of whom shall be appointed by the County Mayor of Stewart County, subject to confirmation by the legislative body of that county,

2

and the remaining two (2) members being the County Mayor of Montgomery County and the County Mayor of Stewart County."

7. Notably, the Inter-Local Agreement additionally states, "The Board shall review annually and adopt and implement annually the Montgomery County Personnel Policy and its Wage, Salary, and Benefit Matrix (however identified) of wage, salary and benefits of its employees." Therefore, all employment matters concerning Bi-County were the responsibility of, and at the discretion of, Montgomery County.

8. In December, 2016, David Graham ("Mr. Graham") was named Director of Bi-County, following a favorable Board vote on such matter. Mr. Graham had absolutely no experience in the field of solid waste. At the time of his hiring, and through the final day of Mr. Graham's tenure at Bi-County, on June 27, 2019, Mr. Graham did not meet the specific requirements contained in the Job Description under which he was hired, not the least of which called for "certification." Mr. Graham was chosen as Director over many other extremely well-qualified professionals in the industry, including Mr. Drake himself. Montgomery County Mayor Jim Durrett ("Mayor Durrett") was Mr. Graham's biggest champion before the Board. Upon information and belief, Plaintiff alleges that Mr. Graham was named as Director due solely to his close personal relationship with Mayor Durrett.

9. In an apparent acknowledgement of Mr. Graham's inexperience in the solid waste field, Mr. Drake, who was already working at Bi-County as Landfill Superintendent, was reassigned, and his position retitled as "Assistant Director of Landfill Operations," as of January, 2017. Indeed, Mr. Drake has over thirty (30) years of experience in the solid waste field, from laborer to upper management. He holds various certifications of the trade, which remain current, and has established healthy and respectable working relationships with the agencies overseeing

the Bi-County landfill, to include the Tennessee Department of Environment and Conservation. At the time of naming Mr. Graham and Mr. Drake to their respective positions, Mr. Drake was called into an informal meeting prior to a Board meeting, with Mayor Durrett, former Stewart County Mayor Rick Joiner, Board members Robert Lee and Ed Baggett, and Board Chairman Jay Albertia. Mr. Drake was told by Mayor Joiner, "Randy, this won't work unless you stay on with Bi-County and take the Assistant Director position." Mr. Drake understood this to mean that Mr. Graham could not handle the leadership of Bi-County alone.

10. Mr. Drake worked for Bi-County from June 1, 2015, until April 18, 2019, when he was discharged, most recently as Assistant Director of Landfill Operations, as aforementioned. Mr. Drake was qualified for his job with Bi-County and performed his job duties in a competent and satisfactory manner. <u>Mr. Drake had no negative employment disciplinary record, whatsoever, up until the date of his termination</u>.

11. Increasingly, as Mr. Graham's tenure at Bi-County progressed, the Board, Mayor Durrett, and others, seemingly lost confidence in Graham's ability to administer the Bi-County operations. This is evident in news reports, and, certainly, the Board meetings, which proceedings were audiotaped, and the written Minutes of such Board meetings. Items of concern were, generally, poor management, decisions on fees, decreasing profits, and whether State procedures and regulations were being followed within the landfills themselves.

12. It became a crusade of Mayor Durrett to institute "flow control" measures for Bi-County, which would mandate that all waste produced in the Bi-County service area would be required to be processed at Bi-County facilities. Not all members of the Board were sold on such concept, to include Stewart County Mayor Robin Brandon ("Mayor Brandon") and Montgomery

County Commissioner John Gannon ("Commissioner Gannon"). The debate over flow control became quite heated in the Board meetings, and became a public discussion.

13. Mr. Drake was consulted by both Commissioner Gannon and Mayor Brandon on a frequent basis, for Mr. Drake's personal opinion on the feasibility and appropriateness of flow control being adopted by Bi-County, as well as for his personal thoughts on Bi-County's overall efficiency, certain policies and concerns there, and ideas for future growth or management ideas. Upon information and belief, by this time, it had become increasingly difficult for Board members and local government to obtain information from Director, Mr. Graham, on such matters. It was not a part of Mr. Drake's official job duties to communicate or report to any Board member or legislator on any matter pertaining to Bi-County. Conversely, this was Mr. Graham's clear obligation.

14. From time to time, Mr. Drake would communicate with local haulers regarding the haulers' personal grievances as to raised tipping fees, for example, wherein such discussions Mr. Drake might express his own doubts as to such rates' fitness for the local market. Communication by Mr. Drake with either Mayor Brandon, Commissioner Gannon, and / or any hauler, would routinely take place via electronic mail, telephone conversation, text messages, or in person. Such communications would frequently be outside of business hours, off the record and private, and in pursuit of Mr. Drake's wisdom from over thirty (30) years of experience in the solid waste industry.

15. The idea of instituting flow control for Bi-County was defeated at the Board level. Mayor Durrett was extremely upset at this decision. He vowed to bring such issue before the Montgomery County Commission, notwithstanding the futility of such a move in the face of the Board's decision. The issue was placed on the Montgomery County Commission's Agenda, and an hours-long debate ensued on the subject of flow control at the Informal Commission Meeting

5

on April 1, 2019. The Commission opposition was led primarily by Commissioner Gannon, though certain haulers spoke against flow control as well. Consequently, the matter was pulled from the Agenda for the Formal Commission Meeting, slated for April 9, 2019, and was not voted on. Thereafter, the issue became moot.

16. The next day, on April 10, 2019, Mr. Graham sent an email to his management team which directed that "if anyone has interaction with members of the board, please make sure I am aware of it. CC me, whatever. Just want to make sure we are tracking everything . . ." This email was an attempt to limit, control, and monitor communications between Bi-County management and employees and certain decision-makers on the Board.

17. On April 18, 2019, Mr. Drake was called into the office of Mr. Graham, Mr. Drake's superior. Present were the Montgomery County Director of Human Resources, Tim Swaw; Mr. Graham; and, a Montgomery County Sheriff's Deputy who stayed near the doorway during the entire meeting. Beside Mr. Graham was a stack of papers, which he seemed to refer to during his introductory remarks to Mr. Drake. Based on the decorum of the proceedings, it was apparent to Mr. Drake that the intent of this meeting was his termination.

18. The first words spoken by Mr. Graham to Mr. Drake were, "Do you admit or deny that you emailed Queen City Disposal?" This was followed by, "What about John Gannon?" Mr. Graham also indicated there were text messages he had questions about. When Mr. Drake became agitated with the meeting's theatrics, he denied same and Mr. Graham looked at the stack of papers beside him and indicated he was going to go through them, ask questions, and use the stack of documents to explain his questions along these lines.

6

19. Upon information and belief, the stack of papers referred to by Mr. Graham and which sat next to Mr. Graham during this meeting, were records of phone and text messages from Mr. Drake's County cellular telephone and email account, which had previously been requested by Mr. Graham from Montgomery County's IT Department.

20. Upon information and belief, there exist emails and / or text messages between Mr. Graham and Mayor Durrett, preceding the April 18, 2019, meeting with Mr. Drake, which discuss Mr. Drake's communications with Mayor Brandon, Commissioner Gannon, and the hauler doing business as Queen City Disposal, wherein Mr. Graham and Mr. Durrett discuss the need to terminate Mr. Drake.

21. As the door to Mr. Graham's office remained open during the questioning of Mr. Drake by Mr. Graham, allowing all insubordinates to hear same, coupled with the Sheriff's Deputy continuing to pace and intimidate, and Mr. Graham's questioning of Mr. Drake being conducted in the manner of a deposition or cross-examination, Mr. Drake left the room. He was called back into the room by Mr. Graham on his cellular telephone. By this time Mr. Drake had went to another part of the landfill property in his assigned County truck. He had contacted his legal counsel for advice, and informed Mr. Graham of this fact.

22. Mr. Drake said he would discuss the matter with Mr. Graham without all of the people and drama in the room. Mr. Graham promised that could take place. When Mr. Drake returned to Mr. Graham's office, nothing in the setting had changed. In fact, another management level employee of Bi-County, Rob Dunn, was also now present in the room. Mr. Graham began again with questions about emails and text messages to certain individuals. At this point, Mr. Drake left the room again. Mr. Graham informed Mr. Drake by telephone that if he was not back in the office within fifteen minutes, he would be terminated. He did not return within that time

7

frame, as Mr. Drake was awaiting advice from his legal counsel, a fact once again communicated to Mr. Graham. Mr. Graham told Mr. Drake he was fired. Mr. Graham ordered Mr. Drake to return the County truck and telephone back to the Bi-County offices. The Sheriff's Deputy, who had been present during the meeting in Mr. Graham's office, also telephoned Mr. Drake, requesting that Mr. Drake immediately return the County truck and telephone, which Mr. Drake promptly did. It was then that management-level employee Rob Dunn immediately went to Mr. Drake's County truck and opened its toolbox. Upon information and belief, a tracking device had been placed in Mr. Drake's vehicle, knowledge of which lay with Rob Dunn and others.

23. On June 27, 2019, Mr. Graham resigned from his position as Director of Bi-County, amid Board scrutiny and scandal. Subsequently, a long-time internal employee, Mark Neblett, was named interim Director, while a search for the new Director was began. After the application process, review of several qualified individuals, and interviews of qualified candidates, the Board once again refused any new leadership, choosing instead to name Mark Neblett as the new Director. The lone dissenting vote for such Board decision was cast by the Stewart County Mayor, Robin Brandon. The installation of Mark Neblett as Director further accomplishes the maintenance of the status quo, and the goal of closely-held operations and a climate of secrecy within the highest levels of Bi-County management, a policy Mr. Drake obviously and detrimentally violated.

24. Speaking to public officials, county commissioners, and Board members about matters of public concern and questionable or illegal conduct was not part of Mr. Drake's regular or official job duties, and his speech was not given pursuant to his duties as Assistant Director of Landfill Operations, but rather, as a cooperative person being asked about his knowledge of the solid waste industry, as such related to issues and proposed management ideas of Bi-County, and

8

as a concerned citizen declaring what he believed to be inefficiency and even wrongdoing in the Bi-County operations. Mr. Drake was engaging in a constitutionally and legally protected activity in his communications so described.

25. Defendant and its agents knew or should have known of Mr. Drake's engaging in protected activity as described above, at the time that they decided to terminate his employment.

26. Prior to his engaging in legally protected activity, Mr. Drake had no negative disciplinary entries in his personnel file. Indeed, the environment at Bi-County found it rare for formal employee discipline to occur at all. The Separation Notice regarding Mr. Drake simply lists "insubordination" as the reason for Mr. Drake's termination. No Board input was sought. In fact, no reason whatsoever has ever been given publicly, or to the Board itself, for the termination of Mr. Drake, Bi-County's Assistant Director of Operations, though one would expect such a decision to be justified and / or explained formally.

27. Mr. Drake suffered an adverse employment action in that Defendant discharged him from his employment with Montgomery County on April 18, 2019.

28. The conduct of the Defendant violated clearly established statutory and constitutional rights of which Mr. Graham and any objectively reasonable person in his position would have known, and such conduct was unreasonable in light of those clearly established rights.

29. There was a causal connection between Mr. Drake's engaging in protected activity and his discharge, which activity was acutely near in time to his discharge.

30. Defendant's purported reasons for discharging Mr. Drake are pretexts for retaliation. Mr. Drake's engaging in protected activity speaking or engaging in speech conduct on matters of public concerns, expressing his silent opposition to flow control being instituted at Bi-County, and educating Mayor Brandon and / or Commissioner Gannon on such matters, clearly

9

motivated and caused his discharge. Defendant's retaliation against Mr. Drake is in violation of 42 U.S.C § 1983 and the First Amendment to the United States Constitution, and the PEPFA.

## CLAIMS

31. Mr. Drake incorporates all of the paragraphs above as if fully stated in each count below.

### Count I

### Violation of 42 U.S.C. § 1983 / First Amendment Retaliation

32. Defendant deprived Mr. Drake of his rights secured by the Constitution while acting under color of state law.

33. Mr. Drake engaged in constitutionally protected speech activity on matters of public concern and his interest in such activity outweighs the County's interest in promoting the efficiency of the public service it provides as an employer.

34. Mr. Drake's speech activity did not disrupt the workplace and Defendant had no legitimate competing interest in prohibiting it for the Court to balance.

35. Mr. Drake suffered an adverse employment action in that he was discharged from employment on April 18, 2019, and his discharge would chill an ordinary person in the exercise of his constitutional rights.

36. Mr. Drake's speech activity was a substantial or motivating factor in his discharge.

37. Defendant terminated Mr. Drake's employment in violation of 42 U.S.C § 1983.

38. Defendant's conduct was undertaken with malice or reckless disregard for or indifference to Mr. Drake's federally protected rights.

10

39.     Defendant's conduct harmed and caused damage to Mr. Drake.

## Count II

## Violation of PEPFA

40.     Mr. Drake's exercise of his right to communicate with elected and other public officials was a substantial or motivating factor in his discharge.

41.     Defendant terminated Mr. Drake's employment in violation of the PEPFA.

42.     Defendant's conduct was intentional, reckless, malicious, and/or fraudulent.

43.     Defendant's conduct harmed and caused damage to Mr. Drake.

44.     Since his termination, Mr. Drake has done his best to mitigate his damages, by securing new employment.  However, such employment is not substantially equivalent to the position Mr. Drake held with Montgomery County at Bi-County.  Mr. Drake's current position does not offer identical promotional opportunities, the same compensation, identical or better job responsibilities, working conditions, or status.  In addition, Mr. Drake's current position has no fringe benefits offered, no medical insurance, no retirement plan, and has required Mr. Drake to be away from home the entire work week, due to the job's distance from Mr. Drake's home.  Mr. Drake is sixty (60) years-old, married, and is a family man.

# RELIEF REQUESTED

Mr. Drake respectfully requests:

1. A jury trial;

2. Back pay and damages for lost benefits;

3. Reinstatement or front pay;

4. Compensatory damages for embarrassment, humiliation, stress, anxiety, inconvenience, and loss of enjoyment of life;

5. Punitive damages;

6. Treble damages under the PEPFA;

7. Attorneys' fees and expenses;

8. Prejudgment interest and, if applicable, post-judgment interest; and

9. Such other and further legal or equitable relief to which he may be entitled.

THIS THE 19th day of November, 2019.

Respectfully submitted,

_____/s/ Joe Weyant_____
Joe Weyant, Attorney for Plaintiff

Joe Weyant, Attorney
Regions Bank Building
128 North Second Street, Suite 201
Clarksville, TN 37040
Phone: (931) 503-9089
Fax:     (931) 503-9044
jweyant@bellsouth.net
TNBPR# 022587