IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| RANDY LEE DRAKE, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | NO. 3:19-cv-01037 |
| v. | ) | JUDGE RICHARDSON |
|  | ) |  |
| MONTGOMERY COUNTY, TENNESSEE, | ) |  |
|  | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

## MEMORANDUM OPINION

Pending before the Court is Defendant's Motion for Summary Judgment (Doc. No. 34, "Motion"), supported by an accompanying Memorandum of Law. (Doc. No. 39). Plaintiff filed a response (Doc. No. 40), and Defendant filed a reply (Doc. No. 45). For the reasons stated herein, Defendant's Motion will be **DENIED as moot.** However, the Court will grant summary judgment to Defendant *sua sponte* on Plaintiff's claim for First Amendment retaliation.

## FACTUAL BACKGROUND

This case stems from the termination of Plaintiff, Randy Drake, from his employment with Bi-County Solid Waste Management System ("Bi-County"). (Doc. No. 1 at 2, 9). Bi-County was established through an Interlocal Agreement between Stewart County, Montgomery County, and the City of Clarksville[1] in 1974. (Doc. No. 41 at 1). The Interlocal Agreement has been amended or revised several times since the initial agreement was entered in 1974, most recently in 2016. (*Id.* at 2). The 2016 version of the Interlocal Agreement notes that it was entered into for the

---

[1] The City of Clarksville opted to terminate its participation in Bi-County in 1994. (Doc. No. 41 at 1).

purpose of Montgomery County and Stewart County "jointly and cooperatively operat[ing]" Bi-County. (Doc. No. 35-6 at 1). Bi-County is operated through the Bi-County Solid Waste Management Board ("Board" or "Bi-County Board") consisting of seven members. (*Id.*).

Plaintiff began working for Bi-County in 2015 as the landfill manager for the UCAR site.[2] (*Id.*). Bi-County then hired David Graham as Director in 2016. (*Id.*). At that time, Plaintiff received a promotion to the position of Assistant Director of Landfill Operations. (*Id.*).

In 2018 or early 2019, the Bi-County Board began considering the implementation of flow control. (*Id.* at 8). Flow control generally refers to the notion that, with respect to waste collected within the Bi-County region, a hauler must either (i) have it processed at Bi-County facilities or, if taken elsewhere (ii) pay Bi-County a fee. (*Id.*). Director Graham was in favor of implementing flow control, but Plaintiff was against it. (*Id.* at 9). After flow control became a topic of discussion during Bi-County Board meetings, Plaintiff was approached by Bi-County Board member Robin Brandon, the mayor of Stewart County, to explain several aspects of the landfill business, including flow control, the anatomy of a landfill, and how landfills worked. (*Id.* at 10). Brandon also solicited Plaintiff's opinion on the flow-control issue. (*Id.*). Additionally, Brandon and Montgomery County Commissioner John Gannon (another member of the Board), would ask Plaintiff about the status of other issues involving Bi-County, such as leachate breakout and how it would be fixed and how construction was going on the new leachate liner. (*Id.*).

At a meeting on March 27, 2019, the Bi-County Board voted not to implement flow control. (*Id.* at 12). After the meeting, Brandon met with Plaintiff in his office. (*Id.*). Then, on April 2, 2019, Brandon confronted Graham in Graham's office, warning him that there were going to be

---

[2] The Court does not see where the Parties have indicated what exactly the "UCAR" site is, but the Court need not seek clarification on this question, which is immaterial for present purposes.

changes to Bi-County and that Graham would be gone. (*Id.*). During this confrontation, Brandon also suggested that Graham should resign from Bi-County. (*Id.* at 13). In turn, Graham requested that IT provide him the phone records and emails of Plaintiff (and two other employees). (*Id.*, Doc. No. 35-2 at 27). When he received the records, Graham discovered that around the same time as Brandon's confrontation with Graham, Plaintiff had been communicating with Brandon and Gannon, as well as a local waste hauler, Queen City Waste. (*Id.*).

Graham held a meeting with Plaintiff on April 18, 2019 at the main landfill office for Bi-County. (*Id.* at 14). After Graham asked a couple of questions, Plaintiff left the meeting, got in his truck, and drove to a leachate lagoon. (*Id.*). Graham called Plaintiff, requesting he return to the meeting. (*Id.*). Plaintiff eventually did return but refused to continue the meeting, before once again leaving the office. (*Id.*). Graham called Plaintiff once more, advising him that if he did not return and continue the meeting, then he would be terminated for insubordination. (*Id.* at 15). Plaintiff declined to return and was subsequently terminated. (*Id.*). The meeting and Plaintiff's ultimate termination were witnessed by Montgomery County Human Resources Director, Tim Swaw. (Doc. No. 44 at 2).

## PROCEDURAL BACKGROUND

Plaintiff filed the present action on November 19, 2019, bringing a federal claim under 42 U.S.C. § 1983 for First Amendment retaliation and a state-law claim under Tennessee's Public Employee Political Freedom Act ("PEPFA"). (Doc. No. 1 at 10-11). On May 7, 2021, Defendant filed the present Motion, seeking summary judgment on each of Plaintiff's claims. (Doc. No. 34). Plaintiff responded (Doc. No. 40) and Defendant replied (Doc. No. 45).

On March 4, 2022, the Court issued an order (Doc. No. 47) informing Plaintiff that the Court was considering *sua sponte* dismissal of Plaintiff's Section 1983 claims under *Monell v.*

*Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978), which limits the circumstances under which a municipality (as opposed to its associated individuals) can be held liable under Section 1983. In accordance with Sixth Circuit practice with respect to potential *sua sponte* dismissals, the Court provided Plaintiff the opportunity to file a supplemental brief opposing the Court's proposed course of action. (Doc. No. 47 at 2 (citing *Shelby Cnty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Tr. Fund*, 203 F.3d 926, 931 (6th Cir. 2000))). Plaintiff filed a supplemental brief on March 31, 2022. (Doc. No. 50). Accordingly, the issue is ripe for review.

## STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018). Accordingly, Courts (appropriately) at times refer interchangeably to a party being able to raise a genuine issue as to fact and a reasonable jury being able to find in the party's favor as to that fact, and this Court does likewise.

It is typically stated that the party bringing the summary judgment motion (the movant) has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *See, e.g. Johnson v. Ford Motor Co.*, 13 F.4th 493, 502 (6th Cir. 2021) ("At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389–90 (6th Cir. 2008))); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). But this is somewhat inexact in the aftermath of 2010 amendments to Rule 56. The movant's initial burden actually is to demonstrate the absence of a genuine issue of material fact, and not necessarily to so demonstrate specifically by referencing portions of the record. True, prior to the 2010 amendments, referencing portions of the record seemed to be the only way to make such a demonstration, and even today that is the primary way to make such a demonstration.[3] But the 2010 amendments added, *inter alia* Rule 56(c)(1)(B), which "recognizes that a party need not always point to specific record materials." Rule 56 2010 Amendment Advisory Committee Note.

Under Rule 56(c)(1)(B), the movant actually has another available means—an alternative to *citing materials in the record*—for demonstrating the absence of a genuine issue of material fact. Specifically, the moving party may meet its initial burden (to indicate the absence of a genuine issue of material fact) by "show[ing]"—even without citing materials of record—that the

---

[3] Under current Rule 56, a party asserting that a fact cannot be or genuinely is disputed—*i.e.*, a party seeking summary judgment and a party opposing summary judgment, respectively—still can (and typically does) attempt to support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. *See* Fed. R. Civ. P. 56(c)(1)(A).

nonmovant "cannot produce admissible evidence to support [a material] fact" (for example, the existence of an element of a nonmovant plaintiff's claim). *See* Fed. R. Civ. P. 56(c)(1)(B).[4]

If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.

## DISCUSSION

The Court will first consider *Monell* liability and whether or not it will grant summary judgment *sua sponte* on the issue. If the Court determines that Plaintiff has raised a genuine dispute as to his ability to show *Monell* liability, then it will proceed to the arguments for summary judgment proposed by Defendant in its Motion.

### I. Plaintiff's Claim for First Amendment Retaliation Will Be Dismissed by the Court *Sua Sponte*

For municipalities, like Defendant, to be liable under Section 1983, a plaintiff must make "a showing that the alleged misconduct is the result of a policy, statement, regulation, decision or custom promulgated by [the county] or its agent." *Ward v. Reynolds*, No. 3:20-CV-00981, 2021 WL 3912803, at *3 (M.D. Tenn. Sept. 1, 2021) (citing *Monell*, 436 U.S. at 690-91).

> A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following circumstances: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official [or official body] with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations."

---

[4] More specifically, Rule 56(c)(1)(B), as added in 2010, provides in pertinent part that a "party asserting that a fact cannot be or is genuinely disputed must support the assertion by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). This means, specifically in the case of a party asserting that a fact *cannot be* genuinely disputed (which typically would be the summary judgment *movant*), that its assertion can be supported by "show[ing]"—even without citing materials of record—that the adverse party (typically the *non-movant*) cannot produce admissible evidence to support the fact.

*Id.* at *3 (quoting *Burgess v. Fisher*, 735 F.3d 462, 478 (6th Cir. 2013)).

Because the Court is raising this issue *sua sponte*, there is no "moving party" who would have to meet an initial burden of showing a lack of genuine dispute as to one of the elements. Instead, the Court will identify evidence from the record that led it to initially question whether Plaintiff could successfully show *Monell* liability via any of the four possible avenues. Regarding the potential avenue for showing an illegal policy or custom,[5] the Court notes that the 2016 version of the Interlocal Agreement states, "The Board shall review annually and adopt and implement annually the Montgomery County Personnel Policy." (Doc. No. 35-6 at 3). For its part, the Montgomery County Personnel Policy states, "All employment with Montgomery County Government is 'at-will.' What this means is that either the employee or Montgomery County Government may terminate the employment relationship at any time for any reason, *but shall not be terminated for an illegal purpose*." MONTGOMERY COUNTY EMPLOYEE PERSONNEL POLICY MANUAL, 13 (Montgomery County, Tennessee, May 13, 2019) (emphasis added). Bi-County's

---

[5] In the present case, where the alleged unconstitutional act is Plaintiff's termination, the Court believes that the relevant "policy" to consider is employment policy as a whole (as opposed to a narrower policy, such as a subset of employment policy as along the lines of "termination policy"). Though the Court does not discern the presence of any termination policy (separate from an overall employment policy) in this case, in any event applicable case law suggests that the focus in this kind of context is on who sets employment policy as a whole, and not on who sets *termination-of-employment* policy either generally or in specific situations (which conceivably could be someone or something different). *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 484 (1986) ("[T]he County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county *employment policy*." (emphasis added)); *see also Binelli v. Charter Twp. of Flint*, 488 F. App'x 95, 99 (6th Cir. 2012) ("Miller could have reasonably believed that she was entitled . . . to fire the deputy supervisor who served only at her 'pleasure,' MICH. COMP. LAWS § 41.61(2), but most *employment policy* in the Township is set by the Board. Miller's authority to make policy on employment matters is thoroughly constrained." (emphasis added)); *O'Connor v. Redford Twp.*, No. 09-10792, 2009 WL 2488095, at *4 (E.D. Mich. Aug. 13, 2009) ("Defendants say that Kobylarz did not have the final authority to make the decision to terminate O'Connor . . . As in the example the Supreme Court gave in *Pembaur*, if the Board delegated its power to establish final *employment policy* to Supervisor Kobylarz, her decision would represent Township policy and could give rise to municipal liability." (emphasis added)).

adoption of the Montgomery County Personnel Policy shows there is no "illegal official [employment] policy" Additionally, the Court does not perceive anywhere in the record evidence of a "custom of tolerance . . . to federal rights violations" within Bi-County. It is undisputed that Plaintiff himself "never reported any wrongdoing or illegal activity at Bi-County and never felt he needed to do so" (Doc. No. 41 at 11), so Plaintiff can hardly claim that he was aware during his employment of incidents suggesting a custom of tolerance for such occurrences within Bi-County. And the record does not suggest in any way that Plaintiff thereafter somehow obtained, through formal discovery or otherwise, evidence of such custom.

Regarding the remaining two avenues for establishing *Monell* liability (a final decision-maker ratifying a decision or a policy of inadequate training or supervision), the Court notes that evidence in the record suggests these also are not viable options. The 2016 Interlocal Agreement notes that the Bi-County Board "shall have: (i) general supervision and control of the employment of clerical, management, and supervisory, and all other personnel necessary and incident to the full and complete administration of the solid waste disposal system." (Doc. No. 35-6 at 3). Additionally, the Agreement says that "[t]he Board shall employ and appoint a Director who shall be a person qualified for training and experience for supervision over the maintenance and operation of the facilities and services herein." (*Id.* at 4). During Director Graham's deposition, he stated that Tim Swaw had been present at his meeting with Plaintiff because Bi-County's personnel policy mirrors Montgomery County's policy, and he was "just trying to make sure that [he] was staying within those guidelines." (Doc. No. 35-2 at 36). Finally, Plaintiff himself acknowledges in his supplemental brief on the *Monell* issue that Director Graham's power to handle Bi-County employees was constrained by the Montgomery County Personnel Policy. (Doc. No. 50 at 5). These facts suggest to the Court that there is no genuine dispute as to either (i) whether a final

decision-maker ratified the (allegedly) illegal act of terminating Plaintiff, or (ii) whether there was a policy of inadequate supervision within Bi-County.

So the record suggests preliminarily an absence of a genuine issue of material fact as to whether there is a basis under *Monell* for Defendant to be held liable under Section 1983. Accordingly, the burden shifts to Plaintiff to show that there is a genuine dispute as to the existence of at least one of the four possible avenues for establishing *Monell* liability. Plaintiff's supplemental brief (Doc. No. 59) seeks to meet that burden by showing that Plaintiff's allegedly illegal termination was ratified by a final policymaker.[6] In this case, Plaintiff argues that Director Graham acted as the final policymaker of Montgomery County employment policy with respect to ratifying his own action of terminating Plaintiff (thereby assuming *the* role of both action-taker and final decision-maker). (*Id.* at 2). Plaintiff first states that Montgomery County is heavily involved in Bi-County's personnel issues. (*Id.* at 4). To illustrate such, Plaintiff points to the

---

[6] Although "policymaking" and "decision-making" generally are not necessarily the same thing, in the instant context courts (including those cited herein) tend to use the term "final policymaker" synonymously with "an official with final decision-making authority." *See Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013) (using the terms "policymaker" and "final decision-maker" interchangeably); *Umfress v. City of Memphis, Tennessee*, No. 20-6115, 2021 WL 2828023, at *3 (6th Cir. July 7, 2021) ("Both are policymaking officials with final decision-making authority."). For simplicity purposes, the Court will proceed with its analysis by using the term "final policymaker."

It is important to clarify what kind of "decision-making authority" an official (or official body) must have to be the "final policymaker" in this context, since many cases involve more than one kind of decision-making authority. As noted below, municipal liability arises only where the decisionmaker possesses final authority *to establish municipal policy with respect to the action ordered* (*i.e.*, the decision made). So the term "final policymaker" is synonymous with "official (or official body) with *final* decision-making authority" *regarding municipal policy* with respect to the decision at issue—as opposed to, for example, decision-making authority *with respect to the decision at issue*. This is a distinction with a difference where, as in the present case, there was an authorized decision-maker (Graham) with respect to the particular decision at issue (to terminate Plaintiff) that was not the same as the final decision-maker with respect to municipal policy regarding the termination that was ordered. It is probably analytically useful to think of Graham as being the *action-taker* (with respect to the termination of Plaintiff) but not necessarily (and in this case, not actually) the *decision-maker* (with respect to municipal policy concerning employment, an area that covers the action at issue).

affidavit of Swaw, who notes that Montgomery County provided HR services to Bi-County as an accommodation but had "no authority over Bi-County or its Executive Director David Graham." (Doc. No. 35-19 at 2). Swaw also notes that occasionally Graham would ask for Swaw's opinion on personnel decisions he (Graham) was considering, including whether he should meet with Plaintiff about his concerns that Plaintiff was not "looking out for the best interest of Bi-County." (*Id.* at 3).

Plaintiff next argues that the Bi-County Director (here, Graham) "is given wide latitude, and authority to fire employees if the need arises." (Doc. No. 50 at 4). As support for this statement, Plaintiff cites Defendant's responses to interrogatories, which note that the Director of Bi-County is responsible for day-to-day activities and handling employees, but ultimately "answer[s] directly to the Board, not to either Montgomery County or Stewart County." (Doc. No. 40-3 at 1–2). Plaintiff also cites to the deposition of Graham, where he states, "As the executive director, I was in charge of all aspects of Bi-County Solid Waste." (Doc. No. 35-2 at 7–8). Additionally, Plaintiff states that Human Resources Director Swaw and Montgomery County Mayor Jim Durrett "acquiesced to and approved of [Plaintiff's] termination, not only leading up to such firing, but also after the fact." (Doc. No. 50 at 5). As evidence of this, Plaintiff cites to the following: Defendant's interrogatory response that notes Director Graham discussed his concerns about Plaintiff's loyalty with Mayor Durrett, as well as Bi-County Chairman Jay Albertia (Doc. No. 40-3 at 12); the fact that Mayor Durrett was aware that Director Graham had requested copies of Plaintiff's emails (Doc. No. 40-4 at 4); and Plaintiff's own affidavit where he notes that the "Personnel Action Form" regarding his termination bears the signatures of Graham, Swaw, Durrett and the Montgomery County Director of Accounts and Budgets. (Doc. No. 40-1 at 2). Finally, Plaintiff cites to a series of emails between Director Graham and Swaw, where the two discuss

Graham's issues with Plaintiff and his desire to discipline/fire him for "subverting" Graham's work as Director. (Doc. Nos. 50-1, 50-2, 50-3).

To determine whether Plaintiff has raised a genuine dispute as to whether his termination was "ratified" by a final policymaker, the Court must consider what constitutes a final policymaker for purposes of this particular basis of municipal liability, as well as what constitutes ratification. In *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), the Supreme Court explained:

> Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. *See, e.g., Oklahoma City v. Tuttle*, 471 U.S., at 822–824, 105 S. Ct., at 2435–2436.11 The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable. Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law . . . We hold that municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

*Id.* at 481–83. The Court went on to offer an instructive illustration:

> Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff is the official policymaker, would give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability.

*Id.* at 483 n.12 (emphasis added). This case makes clear to the Court that Director Graham cannot be considered an official policymaker of Montgomery County for purposes of the theory on which

Plaintiff relies.[7] Similar to the Sheriff in *Pembaur*, Director Graham has been given the authority to hire and fire Bi-County employees, but he must act in accordance with Montgomery County's Personnel Policy that the Bi-County Board voted to adopt. There is no evidence the Bi-County Board ever "delegated its power to establish final employment policy" to Director Graham, and therefore, no evidence that Graham's decisions "give rise to municipal liability."[8]

Plaintiff makes the (albeit brief) alternative argument that Montgomery County Mayor Jim Durrett and HR Director Tim Swaw, as (alleged) final policymakers for Montgomery County employment policy, ratified Director Graham's decision to terminate Plaintiff. This argument proposes a slightly different scenario in which Director Graham would be the action-taker with respect to Plaintiff's termination, but not the policymaker with respect to Montgomery County employment policy. For this theory to give rise to municipal liability, Director Graham's action to terminate Plaintiff would have to have been approved (ratified) by Durrett and Swaw, who themselves would need to have been the final policymakers for county employment policy.

The Sixth Circuit dealt with a similar question in *Feliciano v. City of Cleveland*, 988 F.2d 649 (6th Cir. 1993), which involved a police chief allegedly violating the Fourth Amendment when he subjected police cadets to a surprise drug test. In *Feliciano*, the Sixth Circuit said,

> The plaintiffs next contend that a final policymaker ratified Chief Hanton's actions. The plaintiffs correctly note that "[i]f the authorized policymakers approve

---

[7] Director Graham is, instead, the "action-taker" in this sense suggested in a footnote above, which draws a clear distinction between the final policymaker and the action-taker.

[8] As support for the notion that Graham constituted a final policymaker for Montgomery County, Plaintiff cites to *Williams v. Schismenos*, 258 F. Supp. 3d 842, 864 (N.D. Ohio 2017), which in turn cites to *Monistere v. City of Memphis*, 115 F. App'x 845 (6th Cir. 2004). In *Monsitere*, the Sixth Circuit determined that a police sergeant (who allegedly violated the constitutional rights of two police officers when he required them to submit to a strip search), was a final policymaker for the City of Memphis because his "decision was (1) final, (2) not reviewable, and (3) unconstrained by the existing policies and practices of his supervisory officers." *Id.* at 853. *Monsitere* is clearly distinguishable from the present case, where Director Graham's actions were both reviewable by the Bi-County Board and constrained by the Montgomery County Personnel Policy, which the Bi-County Board had adopted.

> a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final" policy. *Praprotnik*, 485 U.S. at 127, 108 S. Ct. at 926 (plurality opinion). However, mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification. *Id.* Otherwise, the City would be liable for all of the discretionary decisions of its employees, and this would be indistinguishable from *respondeat superior* liability.
>
> In the case at bar, Chief Hanton testified that he informed Turner, the Director of Public Safety, of his intention to drug test the cadets before the test was given. The evidence also shows that Turner fired the police recruits based upon the results of the drug test. However, the plaintiffs have shown no evidence that Turner expressly approved Hanton's decision or that he knew the manner in which the drug test was conducted. Although Turner may have acquiesced in the drug test, this is not enough to survive summary judgment. Ratification of a subordinate's action requires more than acquiescence—it requires affirmative approval of a particular decision made by a subordinate. *See Praprotnik*, 485 U.S. at 130, 108 S. Ct. at 927 (plurality opinion). Therefore, the plaintiffs must offer proof that an official charged with making final policy regarding drug testing of police expressly approved Chief Hanton's actions. *Id.* At best, the evidence offered by the plaintiffs indicates that Turner acquiesced in Hanton's decisions regarding drug testing, but there is no showing that Turner or any other official expressly ratified the decision.

*Id.* at 656.

The only evidence to which Plaintiff points that could conceivably suggest Mayor Durrett and Swaw ratified Graham's termination of Plaintiff is evidence that they both signed Plaintiff's Personnel Action Form detailing his termination. (Doc. No. 40-1 at 13). Plaintiff additionally places considerable emphasis on the fact that both Durrett and Swaw were aware of Graham's issues with Plaintiff, and that Swaw attended the meeting between Graham and Plaintiff. (Doc. No. 40-3 at 12). However, the Court does not believe that any of this evidence demonstrates express approval by either Swaw or Durrett of Plaintiff's termination. Moreover, it does not appear to the Court that Swaw or Mayor Durrett alone would be the relevant final policymaker for employment policy at Bi-County. The overwhelming amount of evidence, including the 2016 Interlocal Agreement (Doc. No. 35-6 at 3–4), the Defendant's responses to interrogatories (Doc. No. 40-3 at 1–2), Director Graham's deposition (Doc. No. 35-2 at 36), and Swaw's affidavit (Doc.

No. 35-19 at 2–3), show that the entity responsible for establishing final employment policy at Bi-County was the Bi-County Board. While Durrett did serve on the Board, his signature alone could not ratify any action, as the 2016 Interlocal Agreement notes that "[a] concurring vote of a majority of all directors [on the Board] shall be necessary for the exercise of [] powers." (Doc. No. 35-6 at 3). And one individual does not constitute the majority of a seven-member board. (*Id.*).

Moreover, the Court notes that even *if* Plaintiff could show that a final policymaker ratified Director Graham's action of terminating Plaintiff, Plaintiff would need to show additionally that "the ratification was a 'moving force' in causing the constitutional violation." *Feliciano*, 988 F.2d at 656 n.6. This requires that a plaintiff "demonstrate a direct causal link between the [final policymaker's] action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 397 (1997). Plaintiff has cited to no evidence whereby a jury could find that the actions of anyone or anything (other than Graham or Plaintiff), final policymaker or not, directly caused the termination in question. It is undisputed that Plaintiff was given the opportunity to return to the meeting with Graham or face termination for insubordination, and he chose to not return. The mere fact that his termination may have been subsequently approved by a (alleged) final policymaker does not mean that the final policymaker's ratification was the "moving force" for the alleged constitutional violation. *See Feliciano*, 988 F.2d at 656 n.6 (noting that even if there was a post-hoc ratification by a final policymaker, there would need to be a separate showing of a causal connection between the ratification and the alleged constitutional violation); *Vandiver v. Meriwether Cnty., Georgia, 3*25 F. Supp. 3d 1321, 1333 (N.D. Ga. 2018) (explaining that a letter from a final policymaker approving an alleged unconstitutional action *after* the action occurred did not clearly have "any actual causative effect upon the alleged unconstitutional action."); *Coffee v. City of Oklahoma City, Oklahoma*, No. CIV-08-239-W, 2009

WL 10669175, at *5 (W.D. Okla. Aug. 4, 2009) ("[Plaintiff's] ratification theory fails because the City's alleged [post-hoc] ratification did not under the circumstances of this case cause the constitutional violations about which [plaintiff] has complained."). For that reason, the Court finds Plaintiff cannot raise a genuine dispute as to whether Defendant, Montgomery County, is liable as a municipality under *Monell*.

## II. Plaintiff's State Law Claim for Violations of PEPFA Will Be Dismissed Without Prejudice.

Plaintiff's second claim is a state-law claim for "violations of PEPFA." (Doc. No. 1 at 11). A district court may decline to exercise supplemental jurisdiction over a claim if (1) the claim raises a novel or complex issue of state law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c); *see also Kinman v. Burnop*, No. 3:18-cv-00809, 2020 WL 707583, at *6 (M.D. Tenn. Feb. 12, 2020).

When no claims over which the court has original jurisdiction remain, courts usually decline to exercise supplemental jurisdiction over the remaining state-law claims. *See Stevens v. Gooch*, 48 F. Supp. 3d 992, 1007 (E.D. Ky 2014) (in usual case in which all federal law claims have been eliminated before trial, balance of factors point toward declining to exercise jurisdiction over remaining state-law claims); *Carpenter v. Lane Coll.*, Case No. 2:17-cv-2672, 2019 WL 845275, at * 4 (W.D. Tenn. Feb. 6, 2019) (having granted summary judgment on plaintiff's sole federal claim, court followed the "usual Sixth Circuit practice" and declined to exercise supplemental jurisdiction over plaintiff's remaining state law claims); *see also Martinez-Rodriguez v. Giles*, 391 F. Supp. 3d 985, 1000-01 (D. Idaho 2019) (after granting summary judgment on plaintiffs' federal claims, court "no longer has federal question jurisdiction, and, in

turn, supplemental jurisdiction over any state law claims dissolves"), cited in *Kinman*, 2020 WL 707583, at *6.

The Supreme Court has noted that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Wilkins v. Tennessee Dep't of Childs.' Servs.*, No. 3:18-cv-00102, 2018 WL 6413666, at *5 (M.D. Tenn. Dec. 6, 2018) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). "In determining whether to retain jurisdiction over state-law claims, a district court should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.'" *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (quoting *Carnegie-Mellon*, 484 U.S. at 350).

The basis for jurisdiction in this case is federal-question jurisdiction, and because the Court is granting summary judgment *sua sponte* on Plaintiff's federal claim, the Court will no longer have original jurisdiction over any claims upon which the Court's (supplemental) jurisdiction over the state-law claim was based. For that reason, the Court declines to exercise supplemental jurisdiction henceforward over Plaintiff's state-law claim, and it will be dismissed without prejudice.

## CONCLUSION

For the reasons discussed above, Defendant's Motion (Doc. No. 34) will be **DENIED as moot**. However, the Court will enter summary judgment *sua sponte* in Defendant's favor as to Plaintiff's Section 1983 claim for First Amendment retaliation (Count I).

Additionally, in the Court's discretion, Plaintiff's state-law claim under PEPFA (Count II) will be **DISMISSED without prejudice** pursuant to 42 U.S.C. § 1367(c), and Plaintiff may file them in Tennessee state court if he wishes.[9]

An appropriate order will be entered.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[9] The Court offers no opinion regarding the extent to which such claims would be successful if filed in state court.